**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **JOSEPH MICHAEL BENSON**<br>125 Willow Pond way<br>Brunswick, GA 31525<br><br>　　　*Plaintiff,*<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF EDUCATION, Rehabilitation Services Administration**<br>400 Maryland Avenue, SW<br>Washington, DC 20202<br><br>and<br><br>**GEORGIA VOCATIONAL REHABILITATION AGENCY**<br>200 Piedmont Avenue SE<br>West Tower 13th Street, Suite 1316<br>Atlanta, GA 30334<br><br>　　　*Defendants.* | Civil Action No. __4:24-cv-00176__ |

## COMPLAINT AND PETITION FOR JUDICIAL REVIEW OF RANDOLPH SHEPPARD ARBITRATION PANEL'S DECISION

Plaintiff, J. Michael Benson ("Mr. Benson"), by and through his undersigned counsel, files this complaint for judicial review, and state as follows:

### INTRODUCTION

1.　　　This is an appeal of Randolph Sheppard dispute and arbitration. Mr. Benson, a blind vendor licensed to operate vending facilities pursuant to the Randolph Sheppard Act ("R-S Act"), 20 U.S.C. § 107 *et seq.*, discovered that the Georgia Vocational Rehabilitation Agency ("GVRA") had taken $217,372.06 in set-aside funds from Mr. Benson in violation of the R-S Act. Specifically, GVRA had taken the money without giving Mr. Benson notice that set-aside collection had been

1

suspended for other blind vendors. Mr. Benson advised GVRA that it had violated the law and demanded repayment. When GVRA refused, Mr. Benson requested a hearing under 20 U.S.C. § 107d-1, which guarantees a blind vendor an evidentiary hearing on _any_ action arising from the operation or administration of the vending facility program. GVRA denied that request, too, so Mr. Benson filed a complaint with the Department of Education, which convened an arbitration panel to determine whether GVRA violated the R-S Act by denying Mr. Benson a hearing.

2.      The arbitration panel found that Mr. Benson's allegations were credible (i.e. GVRA had failed to give notice as required by the R-S Act), but GVRA's refusal to return funds that it had no authority to take in the first place was not a grievable action. It also found that Mr. Benson should have requested a hearing within 15 days of learning about the circumstances under which the funds were taken. Because he did not do so, GVRA did not violate the R-S Act.

3.      The arbitration panel erred in making those determinations. GVRA has no right to keep money that was taken unlawfully and a statutory obligation to return such funds upon request. Furthermore, the R-S Act's hearing guarantee broadly applies to _any_ actions arising from the operation or administration of the vending facility program, and GVRA's decision not to return unlawfully-taken funds is an independent action arising from its operation or administration of the R-S program. Finally, GVRA should have been estopped from arguing that Mr. Benson should have requested a hearing sooner, given that GVRA never would have entertained such a request. Mr. Benson now seeks judicial review of the panel's decision and equitable restitution of his funds.

## PARTIES

4.      Plaintiff J. Michael Benson is a blind vendor licensed to operate vending facilities pursuant to the R-S Act. He operates a vending facility at the Federal Law Enforcement Training Center ("Facility 397") in Savannah, Georgia.

5.      Defendant United States Department of Education, Rehabilitation Services Administration ("RSA") is the federal agency responsible for carrying out the mandates of the R-S Act at the federal level, including convening arbitration panels to resolve blind vendor disputes pursuant to 20 U.S.C. § 107d-1(a).

6.      Defendant Georgia Vocational Rehabilitation Agency ("GVRA") is the designated state licensing agency ("SLA") that administers the R-S Act vending facility program in Georgia, known as the Business Enterprise Program ("BEP").

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 20 U.S.C. § 107d-2 and 28 U.S.C. § 1331.

8.      Venue is proper under 28 U.S.C. § 1391, as action arose in Savannah, Georgia.

## FACTUAL ALLEGATIONS

9.      The R-S Act gives blind vendors priority to operate vending facilities on federal property. 20 U.S.C. § 107.

10.     Blind vendors do not obtain contracts directly with the federal government. Rather, a designated state licensing agency ("SLA") obtains the contract on their behalf and then licenses, trains, and assigns blind vendors to operate those facilities.

11.     At all relevant times, Mr. Benson was a licensed blind vendor assigned by GVRA to operate Facility # 397.

12.     Blind vendors are often required to pay "set aside funds," which are "funds which accrue to a State licensing agency from an assessment against the net proceeds of each vending facility in the State's vending facility program and any income from vending machines on Federal property which accrues to the State licensing agency." 34 C.F.R. § 395.1(s).

3

13.    The R-S Act limits when and how such funds can be taken from blind vendors. *See* 20 Funds can only be "set aside" "if it is determined by a majority vote of blind licensees licensed by such State agency, after such agency provides to each such licensee full information on all matters relevant to such proposed program, that funds under this paragraph shall be set aside for such purposes." 20 U.S.C. § 107b(3).

14.    Likewise, the R-S Act must be administered in a uniform manner.

15.    On March 18, 2020, the Georgia Committee of Blind Vendors ("CBV") voted to temporarily suspend the collection of set-aside funds for BEP facilities with an annual net income of $200,000 or less for six months (6), effective March 1, 2020 to August 31, 2020 (the "Suspension").

16.    On October 2, 2020, the CBV voted to extend the Suspension for an additional nine (9) months until May 31, 2021.

17.    Only the CBV – not the full body of blind vendors – voted on the Suspension.

18.    The annual income from Facility # 397 exceeded the $200,000 threshold for the Suspension, so 12% of Mr. Benson's gross profits continued to be set aside between March 2020 and May 2021 for the benefit of all vendors.

19.    A total of $217,372.06 was withheld from Mr. Benson during those time periods, while some vendors paid nothing.

20.    Mr. Benson did not receive notice from GVRA about the Suspension. In fact, GVRA does not even have a standing operating procedure for giving notice to blind vendors about set-aside funds.

21.    Mr. Benson learned about the Suspension from another blind vendor in October of 2021.

22.     Mr. Benson later obtained records through a Public Information Act ("PIA") request, which confirmed that GVRA did not comply with the notice provisions of the R-S Act with regard to the Suspension and that the full body of blind vendors did not vote on the matter.

23.     GVRA has no right to keep money that was taken in violation of the R-S Act.

24.     On October 4, 2022, Mr. Benson sent a letter to the GVRA director demanding the return of the $217,372.06 in set-aside funds unlawfully collected from him during the Suspension.

25.     On October 18, 2022, GVRA denied Mr. Benson's demand for repayment, insisting that it had followed the law when, in fact, it had not. Its response letter stated, in part: "GRVA-BEP maintains that all actions it took regarding the temporary suspension of set-aside were undertaken in accordance with all applicable laws and regulations."

26.     The R-S Act provides that "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency..." 20 U.S.C. § 107d-1(a).

27.     On November 7, 2022, Mr. Benson requested a full evidentiary hearing regarding the GVRA's refusal to return money that was taken from him in violation of the R-S Act.

28.     On December 12, 2022, GVRA denied Mr. Benson's request for a hearing on the grounds that it was not filed within 15 business days of the Suspension, which is the deadline provided in GVRA's Rules and Regulations for the BEP vending facility program.

29.     The R-S Act provides that if a "blind licensee is dissatisfied with any action taken or decision rendered as a result of" the evidentiary hearing stage, "he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this

title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter." 20 U.S.C. § 107d-1.

30.     On February 27, 2023, Mr. Benson filed a complaint with the Department of Education asking it to convene an R-S arbitration panel to arbitrate his dispute against GVRA and grant him disposition and relief on several issues.

31.     On May 30, 2023, the Department of Education convened an arbitration panel to decide whether GVRA violated the R-S Act when it denied Mr. Benson's request for an evidentiary hearing on GVRA's denial of his demand for repayment.

32.     On March 11, 2024, the arbitration panel held a hearing on *Benson v. Georgia Vocational Agency*, R-S/23-01, in Savannah, Georgia. Mr. Benson testified, and his attorney questioned GVRA Director Teresa Eggleston. GVRA did not present a case.

33.     On June 14, 2024,  the arbitration panel issued its decision in R-S/23-01. **Exhibit A.**

34.     The panel concluded that GVRA did not violate the R-S Act when it denied Mr. Benson's request for a hearing.

35.     That conclusion turned on two issues: (1) what constitutes an "action" under the R-S Act's guarantee that a blind vendor "dissatisfied with any action arising from the operation or administration of the vending facility" is entitled to a hearing, and (2) when the 15-day limitations period began to run.

36.     On the first issue, the panel found that GVRA's refusal to return Mr. Benson's funds was not a grievable "action," because it could not have been written absent the Suspension, which "more closely resembled 'something done' than did the Agency's issuance of the October

18, 2022, letter" denying his demand for repayment. Ex. A at 17–19.  The panel also opined that

Mr. Benson's interpretation of the R-S Act would lead to absurd results.

37.    On the second issue, the panel presumed that Mr. Benson did *not* receive notice of

the Suspension as required by the R-S Act. Ex. A at 19. The panel found his testimony credible,

and GVRA offered no evidence that it had complied with the notice requirements. *Id.* at 19–20.

38.    Nevertheless, the panel found that the 15-day limitations period began to run in

October 2021, when Mr. Benson received actual notice of the Suspension.  Ex. A at 20.

39.    The panel rejected Mr. Benson's argument that it would have been futile to request

a hearing at that time, given that GVRA had already denied another vendor's request as untimely,

and all subsequent actions by GVRA firmly indicated that it would not have granted such a request.

40.    As of the date of this filing, GVRA still refuses to return Mr. Benson's funds.

## CAUSES OF ACTION

### COUNT I
**Appeal and Judicial Review of the Arbitration Panel's Decision in R-S/23-01
Against the U.S. Department of Education**

41.    All preceding paragraphs are fully incorporated herein by reference.

42.    An arbitration panel's decision is "subject to appeal and review as a final agency

action" under the Administrative Procedure Act ("APA"). 20 U.S.C. § 107d–2(a).

43.    The reviewing court shall "hold unlawful and set aside agency action, findings, and

conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with
law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory
right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

5 U.S.C. § 706.

44.     An arbitration panel's conclusions of law and interpretations of the R-S Act are not entitled to deference.

45.     In R-S/23-01, the arbitration panel erred when it concluded that GVRA's refusal to return funds taken in violation of the R-S Act was not a grievable "action."   The R-S Act uses broad and unambiguous language to define the right to a hearing. A blind vendor who is "dissatisfied with _any_ State licensing agency action arising from the operation or administration of the vending facility program" is entitled to a hearing. 107 U.S.C. § 107d-1(a); 34 C.F.R. § 395.13(a). That procedural guarantee is broad and virtually unlimited. _See Georgia Dep't of Hum. Res. v. Nash_, 915 F.2d 1482, 1484 (11th Cir. 1990).

46.     Here, Mr. Benson was dissatisfied with GVRA's denial of his demand for repayment of funds taken from him in violation of the R-S Act.

47.     Upon receiving notice that it had violated the R-S Act by (i) failing to give notice of the Suspension, (ii) failing to hold a vote by the full body of blind vendors, and (iii) failing to apply the Act in a uniform manner, GVRA should have returned Mr. Benson funds. Indeed, GVRA has no right to keep funds that belong to a blind vendor and were unlawfully taken from him.

48.     GVRA refused to return Mr. Benson's funds despite clear and accurate evidence that the funds never should have been taken from Mr. Benson in the first place.

49.     The decision not to return Mr. Benson's funds is a singular, independent action arising from the operation and administration of the vending facility program. Indeed, an SLA's duty and/or authority to set-aside funds generated by a blind vendor and/or a BEP vending facility derives from the R-S Act.

50.     Under the plain language of the R-S Act, Mr. Benson should have received a hearing on whether GVRA was obligated to return his funds.

51.     The panel also erred in concluding that the 15 day window for requesting a hearing began when Mr. Benson learned about the Suspension. GVRA had consistently and unequivocally indicated throughout Mr. Benson's case and other matters that it would _not_ have granted him a hearing had he requested one within that window of time.   Furthermore, GVRA repeatedly indicated that it followed the law when, in fact, it had not. GVRA should have been estopped from arguing that Mr. Benson had an obligation to request a hearing under those circumstances.

52.     Thus, the arbitration panel's decision was arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, and Mr. Benson is entitled to relief.

### COUNT II
### Equitable Restitution
### Against the Georgia Vocational Rehabilitation Agency

53.     All proceeding paragraphs are fully incorporated herein by reference.

54.     The $217,372.06 in funds set aside from during the Suspension were generated by Mr. Benson's operation of Facility # 397 and, thus, were and still are his property.

55.     That property is specifically identifiable. There is no dispute over the precise amount of funds – $217,372.06 – that were taken from Mr. Benson during the Suspension.

56.     That property is traceable. On information and belief, $217,372.06 is still in GVRA's possession and/or control through the set-aside account.

57.     GVRA had no statutory or contractual right to take that property from Mr. Benson when it did so. The R-S Act grants GVRA authority to set aside funds from blind vendors only in limited circumstances and only for limited purposes. GVRA exceeded its authority under the R-S Act when it set aside $217,372.06 in funds generated by Mr. Benson's facility during the Suspension without providing notice, without holding a vote among the full body of blind vendors, and in a manner that deprived blind vendors of uniform treatment.

58.     Given Mr. Benson's statutory right to earn the proceeds of his business and not have such funds set aside by an SLA unless certain conditions are met, GVRA has an obligation to return funds that were taken illegally.

59.     GVRA has refused Mr. Benson's request for demand of repayment of those funds.

60.     GVRA will be unjustly enriched if it keeps Mr. Benson's $215,372.06 funds.  The arbitration panel found no evidence that notice of the Suspension was given to Mr. Benson as required by the R-S Act, yet the panel found that Mr. Benson was not entitled to a hearing – the primary procedural mechanism available to him, as a blind vendor, for recovering those funds.

61.     Thus, Mr. Benson is entitled at equity to restitution in the amount of $215,372.06.

62.     Mr. Benson has exhausted his administrative remedies under the R-S Act.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff J. Michael Benson prays this Court will enter judgment in his favor and grant him the following relief:

A) A declaration that the arbitration panel erred in concluded that GVRA did not violate the R-S Act when it denied Mr. Benson's request for a hearing;

B) A declaration that the arbitration panel erred when it concluded that GVRA's denial of Mr. Benson's demand for repayment was not a grievable action under 20 U.S.C. § 107d-4.

C) A declaration that Mr. Benson's request for a hearing was therefore timely or, in the alternative, a declaration that the arbitration panel erred in concluding that the 15 day limitations period began in October 2021;

D) An Order setting aside the arbitration panel's decision on the grounds that it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the R-S Act, unsupported by substantial evidence of the record, in excess of statutory jurisdiction, and contrary to Mr. Benson's constitutional rights and privileges;

E) An Order that GVRA pay restitution to Mr. Benson in the amount of $215,372.06;

F) An Order awarding Mr. Benson his reasonable attorney's fees and costs incurred in his arbitration and in this proceeding on appeal; and

G) Any other relief that this Court deems just and proper.

Dated: August 13, 2024

By: _Lauren A. Warner_
Lauren A. Warner (GA 425769)
Chilivis Grubman
1834 Independence Square
Atlanta, GA 30030
(t) 404.233.4171
lwarner@cglawfirm.com

Lauren McLarney*
Rosenberg Martin Greenberg, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
(t) 410.727.6600
lmclarney@rosenbergmartin.com
* _Pro hac vice pending_

# EXHIBIT A



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

REHABILITATION SERVICES ADMINISTRATION

COMMISSIONER

June 27, 2024

Lauren McLarney
Rosenberg Martin Greenberg, LLP
25 South Charles St., 21st Floor
Baltimore, MD 21201

Amy C. Casey, Staff Attorney
Office of General Counsel
200 Piedmont Ave., SE
West Tower, 13th Floor
Atlanta, GA 30334

> Re:   J. Michael Benson v. Georgia Vocational
>        Rehabilitation Agency, Case no. R-S/23-01

Dear Ms. McLarney and Ms. Casey:

The Rehabilitation Services Administration has received the decision of the arbitration panel in the matter of J. Michael Benson, petitioner v. the Georgia Vocational Rehabilitation Agency, respondent.

Pursuant to Section 15(c) of the "Policies and Procedures for Convening and Conducting an Arbitration," we are enclosing an electronic copy of that decision.

If you have any questions, please contact Jim McCarthy, Program Specialist, at James.Mccarthy@ed.gov or (202) 245-6458.

Sincerely,

Danté Q. Allen

Enclosure

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2600

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

| | | |
|---|---|---|
| IN THE MATTER OF THE ARBITRATION | ) | <u>OPINION AND ORDER</u> |
| | ) | |
| between | ) | |
| | ) | |
| JOSPEPH MICHAEL BENSON | ) | Case No. R-S/23-01 |
| | ) | |
| and | ) | |
| | ) | |
| GEORGIA VOCATIONAL | ) | |
| REHABILITATION AGENCY | ) | |

<u>PANEL</u>

Vincent C. Longo, Chair, Arbitrator
Albert Elia, Arbitrator
Andrew Schumacher, Arbitrator

<u>ISSUE</u>

Denial of Request for Full Evidentiary Hearing

<u>HEARING</u>

March 11, 2024
Savannah, Georgia

<u>BRIEFS RECEIVED</u>

May 1, 2024

<u>DATE OF OPINION AND ORDER</u>

June 14, 2024

<u>APPEARANCES</u>

<u>For the Complainant</u>                          <u>For the Agency</u>
Lauren M. McLarney, Esq.                  Amy Catherine Casey, Esq.
ROSENBERG MARTIN                      GEORGIA VOCATIONAL
GREENBERG, LLP                            REHAB. AGENCY

ADMINISTRATION

The parties mutually selected the undersigned arbitrators to hear and decide this dispute.  An evidentiary hearing was held on March 11, 2024, in Savannah, Georgia, at which time the parties were afforded a full and complete opportunity to present documentary evidence and to examine and cross-examine witnesses.  The parties filed briefs on May 1, 2024, and the matter is now ripe for final disposition.

GRIEVANCE

On November 7, 2022, Complainant J. Michael Benson filed a Grievance and Request for Evidentiary Hearing with the Georgia Vocational Rehabilitation Agency. The Grievance alleged the Agency unlawfully denied Mr. Benson's demand for reimbursement of "set-aside funds" that were collected from him in alleged violation of his rights under the Randolph-Sheppard Act.  The Grievance requested a full evidentiary hearing.

On December 12, 2022, the Georgia Vocational Rehabilitation Agency denied the Grievance on the grounds it was not filed within 15 business days of the alleged improper action by the Agency.

On February 27, 2023, Mr. Benson requested the United States Department of Education convene a Randolph-Sheppard Act arbitration panel to arbitrate the dispute.

On May 30, 2023, the Department of Education authorized the convening of the undersigned arbitration panel to hear and render a decision on whether the Georgia Vocational Rehabilitation Agency's denial of a full evidentiary hearing to Mr. Benson was in violation of the Randolph-Sheppard Act.

## ISSUE

The central issue identified by the Department of Education is whether the Georgia Vocational Rehabilitation Agency violated the Randolph-Sheppard Act when it denied Complainant J. Michael Benson's request for a full evidentiary hearing.

## RELEVANT STATUTE AND REGULATIONS

### 20 U.S.C.A. § 107d-1

#### § 107d-1.  Grievances of blind licensees

(a)  Hearing and arbitration

Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title.  If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

…

#### Business Enterprise Program Rules and Regulations

IV.      Complaints, Hearings and Arbitration

…

      B.      Full Evidentiary Hearing Procedure

         If the issue(s) is not resolved at the administrative review level, the licensed blind vendor or blind licensee (hereinafter, vendor), may request a full evidentiary hearing under the following procedures:

         …

3

2.       A vendor making a request for a full evidentiary hearing must do so within 15 working days from the date of the decision from an administrative review.

3.       A vendor must request a full evidentiary hearing in writing. This request must be made to the Executive Director of the Georgia Vocational Rehabilitation Agency, who serves as Administrator of the State Licensing Agency or to the Committee of Blind Vendors in accordance with 34 CFR 395.14 (b) (2). The request must be made within the appropriate time frame, unless an extension is made by the Executive Director Georgia Vocational Rehabilitation Agency due to extenuating circumstances. It is suggested that it be mailed by certified/return receipt mail if not delivered by hand.

…

…

## FACTS

The instant dispute arose under the Randolph-Sheppard Act ("RSA"), 20 U.S.C. Sec. 107 *et seq.* The RSA, in an effort to assist blind persons in becoming financially self-supporting, provides them with priority in bidding on contracts to operate vending facilities on Federal property. The RSA vending program is administered through designated State Licensing Agencies ("SLAs"). The SLA for Georgia is the Georgia Vocational Rehabilitation Agency ("Agency").

The RSA provides a mechanism for blind vendors to file grievances with a SLA: "Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title." 20 U.S.C. Sec. 107d-1(a).

4

Georgia's RSA vending program, the Business Enterprise Program ("BEP"), in turn provides Rules and Regulations for many aspects of the RSA vending program, including procedures for evidentiary hearings.  The Agency submitted those proposed Rules and Regulations to the Department of Education, which approved the current rules prior to enactment by the Agency.  Pursuant to the BEP's Rules and Regulations, Paragraph IV.A, a vendor who is dissatisfied with any Agency action may seek a remedy by requesting an administrative review of the action within 15 working days of the occurrence of the action.  The review will be conducted by a person or persons on the administrative staff who have not actively participated in the challenged action.

Pursuant to Paragraph IV.B of the BEP Rules and Regulations, "[i]f the issue is not resolved at the administrative review level, the licensed blind vendor or blind licensee (hereinafter, vendor), may request a full evidentiary hearing. . . ."  Furthermore, "[a] vendor making a request for a full evidentiary hearing must do so within 15 working days from the date of the decision from an administrative review."

On March 18, 2020, the Georgia Committee of Blind Vendors ("CBV") voted to temporarily suspend the collection of "set-aside funds" during the COVID-19 Pandemic. Set-aside funds are funds collected from the net proceeds of the vendors for the benefit of the entire program.  The Agency accepted and supported the temporary suspension of the set-aside funds.  The suspension was effective from March 1, 2020, to August 31, 2020. Moreover, the temporary suspension of the collection of set-aside funds was applicable only to facilities with an annual net income of less than $200,000  The suspension of the set-aside funds was subsequently extended for an additional eight months, through October 2020.

J. Michael Benson, the Complainant herein, operates a BEP vending facility at the Federal Law Enforcement Training Center ("Facility") in Savannah, Georgia.  He was the blind vendor assigned to the Facility during the period of March 1, 2020, to May 31, 2021.  Because his annual net income was greater than $200,000, Mr. Benson did not qualify for the suspension of set-aside funds and continued to pay into the fund.  The total amount of set-aside funds collected from Mr. Benson during the relevant time period was $217,372.05.

Mr. Benson first learned of the suspension of set-aside funds in October 2021 after speaking to retired blind vendor Franklin Hulsey.  Mr. Benson then reviewed his emails from 2020 to determine if he had been notified of the suspension.  He found no evidence of notification.  Mr. Benson then sent an email on October 20, 2021, to Jerry Bensman of the Georgia Co-Op, which assists the Agency in administering the RSA program.  In his email, Mr. Benson inquired whether it was true that set-asides were suspended for Georgia BEP vendors from March 2020 through May 2021 and whether the CBV voted on the action.  Mr. Bensman responded via email as follows:

> Hi Mike,
>
> The CBV requested the SLA to suspended [sic] set-aside for all vendors who made less than $250,000.  The SLA agree.  So yes the CBV voted on this action.

Mr. Benson suspected the Agency had violated the RSA but did not file a grievance at this time.  He testified at hearing that he did not immediately file a grievance regarding the suspension because "Mr. Hulsey told [him] that he and another vendor had already filed a grievance for [the suspension] and that they were both denied" as untimely.  The Agency had, in fact, denied Mr. Hulsey's grievance as untimely.

6

Approximately six months later, Mr. Benson obtained legal counsel.  He then submitted a request under the Public Information Act seeking copies of any notices that were posted or circulated to blind vendors regarding the suspension of set-aside funds. The Agency responded and, per Mr. Benson's testimony at hearing, the response showed that the full body of licensees had not voted on the suspension of set-aside funds and notice of the suspension was not provided to blind vendors.

On October 4, 2022, approximately one year after Mr. Benson learned of the set-aside suspension, Mr. Benson sent a letter to BEP Director Teresa Eggleston demanding payment of $217,327.06 in set aside funds collected from him from March 1, 2020, to May 31, 2021.  The letter, sent by counsel for Mr. Benson, alleged the funds had been collected in violation of Section 107b(3) of the RSA and Sections 395.9 and 395.3(a)(11)(i) of its implementing regulations.  Specifically, Mr. Benson alleged the Agency violated the RSA by failing to provide notice of the set-aside suspension; failing to hold a vote of the body of vendors; and failing to uniformly apply the RSA.

Via letter dated October 18, 2022, M. Zain Farooqui, General Counsel for the BEP, denied Mr. Benson's request for payment on the grounds that "all actions [the BEP] took regarding the temporary suspension of set-aside were undertaken in accordance with all applicable laws and regulations."

On November 7, 2022, Mr. Benson sent a letter to the Agency ("Grievance") requesting a full evidentiary hearing regarding the Agency's October 18, 2022, letter denying his demand for payment.  Via letter dated December 12, 2022, the Agency rejected Mr. Benson's request for a full evidentiary hearing on the grounds that the request was untimely.  The letter stated that, per the BEP Rules and Regulations, "[a]

timely written request to review an action must be made by the licensed blind vendor and submitted to the Director of BEP no later than fifteen (15) business days from the occurrence of the action."

The Agency letter continued as follows:

Your written request for a hearing expressing your dissatisfaction with the decision to suspend set-aside collections was submitted to the BEP Director on November 7, 2022.  Your request is over 2 ½ years after the action was initially taken by the CBV and the SLA (i.e., vote on March 18, 2020, by the CBV with subsequent approval by the SLA on March 24, 2020, and then again voted upon and approved on October 2, 2020).  In fact, you had waited over eighteen (18) months after the suspension of set-aside collection was lifted on May 31, 2021, to submit your current grievance.  The action taken by the CBV and SLA was deliberated and formally voted upon, not once, but twice during the 18 months while the suspension was in effect.  At no time had Mr. Benson expressed his dissatisfaction with the suspension by filing a written request as permitted in accordance with BEP Rules and Regulations.

…

On February 27, 2023, Mr. Benson requested the instant arbitration panel be convened to decide several issues, including whether the Agency violated the RSA by denying his request for a full evidentiary hearing on his demand for payment.

On May 30, 2023, United States Department of Education issued a Convening Letter authorizing the convening of an arbitration panel to hear and render a decision on one issue raised by Mr. Benson:  "The central issue to be addressed is whether the SLA's denial of an evidentiary hearing to Mr. Benson is a violation of the Act."

The undersigned arbitrators were subsequently selected.  The arbitrators conducted an evidentiary hearing on March 11, 2024, in Savannah, Georgia.  Testifying during Mr. Benson's case-in-chief were Ms. Eggleston and Mr. Benson.  The Agency did not call any witnesses.  The record was closed at the conclusion of the hearing and the

parties filed post-hearing briefs on May 1, 2024. The matter is now ripe for final disposition.

POSITIONS OF THE PARTIES

COMPLAINANT POSITION

Mr. Benson takes the position that the RSA is governed by Federal law and cannot be limited by a contradictory state law. The RSA is a federal statute concerning federal property; the state merely administers the program. While the remedial scheme begins at the state level with an evidentiary hearing, the second step (arbitration panel) is convened by a federal agency and the final step is an appeal to federal court. Federal courts have repeatedly held that when a state law conflicts with the RSA's regulations, federal law must control. *Delaware Dept't of Health & Soc. Servs., Div. for Visually Impaired v. U.S. Dept's of Educ.*, 772 F.2d 1123 (3d Cir. 1985); *New Hampshire v. Ramsey*, 366 F.3d 1 (1st Cir. 2004); *Tamashiro v. Dept't of Human Services*, 146 P.3d 103 (2006).

The Agency claims that a state court case limits application of the grievance provision of the RSA, but *International Keystone* is inapposite because the BEP rules were not codified pursuant to the state APA. Instead, the BEP rules are maintained pursuant to a federal mandate to implement a federal remedial scheme. Moreover, applying *International Keystone* would restrict blind vendors' federal due process rights, and its application is foreclosed by the Supremacy Clause.

The RSA broadly guarantees due process for "any" action. Federal courts have interpreted this guarantee as being broad and virtually unlimited. *See Georgia Dep't of Hum. Res. v. Nash*, 915 F.2d 1482 (11th Cir. 1990). The plain, ordinary definition of the

term "any" connotes unlimited breadth.  Yet, the Agency insists the grievance provision is restricted to adjudicatory actions only as a restrictive qualifier on blind vendors' rights to an evidentiary hearing.  But the word "adjudicatory" does not appear anywhere in the RSA, and where Congress has omitted a word from a statute, it is presumed to have been done intentionally.  *See U.S. v. Mellerson*, 145 F.3d 1255 (11th Cir. 1998).

The Agency's interpretation of "any" would lead to absurd results.  If taken to the extreme, the Agency would have unfettered power to take any "executive action" it desires and be wholly insulated from accountability by blind vendors.

The Agency further claims that permitting a vendor to issue a letter to force something that allegedly equates to an agency action is inappropriate and would throw the RSA into a volatile arena.  But the Agency's response is what equated to the agency action at issue.  Had the Agency done the right thing and returned Benson's funds, there would have been no action to contest or hearing to request.  In other words, Benson's letter did not force a controversy.  The subtext of the Agency's argument is that blind vendors should do nothing when they discover money has been taken from them unlawfully.

The Agency's denial of Mr. Benson's demand for repayment is distinct from the suspension.  Mr. Benson did not request a hearing on the suspension; his grievance arose out of the Agency's denial of his demand for repayment of funds collected in violation of the RSA.  That the contested action is connected to another is of no import.  The two actions would invite different questions and warrant different remedies.  Had Mr. Benson brought his grievance at the time of the suspension, the hearing officer could have ordered that a vote be taken.  But a hearing on the denial of repayment will involve

separate questions pertinent to equitable restitution, such as where the funds are today and whether the hearing officer has authority to move them.   Under the Agency's interpretation, a blind vendor could never grieve a continuing violation and the Agency would have no duty to right a wrong that is later brought to its attention.

Finally, even if the Grievance arose out of his dissatisfaction with the suspension, the limitations period should be equitably tolled.   The Agency's rigid position is too dangerous to accept.   The Agency insists the 15-day limitations period begins as soon as the action begins, regardless of when the vendor knows about it, even if the SLA is the very reason the vendor did not know sooner.   Furthermore, the 15-day window arguably does not begin until the SLA gives notice about set-asides required by 20 U.S.C. Sec. 107b(3).   Because the Agency never gave notice here, it is manifestly unfair to insist that the 15-day period has passed before it even started.

Even if the panel construes Mr. Benson's informal email from Bensman as satisfying the formal notice requirement, the Agency still discouraged Mr. Benson from filing his grievance within 15 days of that email.   Upon learning about the suspension, Mr. Hulsey filed a grievance, but it was swiftly denied as untimely.   There is no reason to believe Mr. Benson would have been treated differently.   Ms. Eggleston was given multiple opportunities to contend otherwise, but she offered nothing more than word salad.   Worse, when Mr. Benson later demanded repayment instead of filing a grievance, the Agency maintained it had followed the law when, in fact, it had not.

If the clock starts when the decision is made, then knowledge cannot matter.   But Ms. Eggleston cannot say that, because the RSA guarantees a full evidentiary hearing on acts with which the blind vendor is dissatisfied, and a vendor cannot be dissatisfied with

an action he knows nothing about.  If knowledge of an action matters, then the clock starts when the vendor learns of the act and becomes dissatisfied.

The Agency argues that equitable tolling should not apply because "Mr. Benson waited over a year after knowing the set aside was suspended" and did not act with "due diligence and reasonableness" before filing his appeal.  That assertion is patently inconsistent with the evidence.  Mr. Benson reviewed his own emails, contacted multiple people, sought counsel, and filed a PIA request to investigate the truth of what he heard.

The Agency claims there was no need for a PIA request and the deadline is very clear in the rules.  The Agency cannot have it both ways.  Either Mr. Benson should have acted with due diligence upon learning about the suspension (which he did), or he should have known that the SLA would not entertain any requests for an evidentiary hearing at that time and accepted it without a fuss.  Yet Mr. Benson did both, assuming he would be treated like Mr. Hulsey while still diligently investigating his claims.

Finally, the Agency's original argument about administrative reviews not being exhausted were not developed at hearing and, in any event, have no merit.

## AGENCY POSITION

The Agency contends its issuance of a letter denying Benson's demand for payment was not an appealable action.  While the Supreme Court has not addressed this issue, under *International Telephone & Telegraph Corp. v. Local*, 419 U.S. 428 (1975), some kind of formalized action must take place.  This definition is further discussed in *Travelers Indemnity Co. v. U.S.*, 593 F.Supp.625 (1984), wherein a governmental body issued a demand letter to the insurance company demanding payment on a claim.  The company appealed the letter pursuant to the Federal Administrative Procedure Act

claiming the demand letter was an agency action subject to appeal.  However, the court held that a demand letter was not an agency action, as it did not meet the threshold stated in the APA.

In this case, Benson had demanded repayment based on an agency action that was ripe for appeal long before expressing any dissatisfaction.  The Agency promptly issued a letter clarifying that the opportunity to contest the decision had lapsed.  There was no rulemaking, adjudication, licensing, or administrative penalty invoked by merely responding to a letter.  Interpreting the issuance of a response to a demand as grounds for appeal would render the statute of limitations meaningless and lead to absurd outcomes.

The denial of Benson's payment demand does not constitute a justification for filing a grievance.  Instead, it merely affirms the original action taken by the Agency from March 2020 to May 2021.  The demand letter would not even exist but for the actions taken by the Agency two years prior.

Benson was aware of the suspension of set-aside in October 2021 yet still delayed over a year before making his demand and filing a grievance.  The Agency reasonably relied on the Committee of Blind Vendors to disseminate information and it is the CBV's duty as laid out at Section 1.4 of their bylaws.  Reversing the denial of an untimely request would foster an unpredictable atmosphere where challenges to Agency decisions could arise at any time.  The resulting volatility in program implementation poses risks to all stakeholders.  A stable and predictable regulatory framework is essential for the effective functioning of the BEP and ensures equitable treatment for all participants.

The 15-day clock did not start with the issuance of the Agency's letter denying Benson's demand.  The appealable action occurred in 2020, two years prior to the

demand letter.  The demand letter would not exist but for the original Agency action, as explicitly admitted by Benson:  "There would be nothing to deny . . . if the suspension had not happened."

With regard to equitable tolling, such a remedy should only be used sparingly. Equitable tolling is subject to the due diligence of Benson.  Equitable tolling is inappropriate where a plaintiff either fails to file an action in a timely manner despite being in a position to reasonably know of the claim or fails to exercise due diligence.

Pursuant to *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990), a party invoking equitable tolling must show (1) that it was prevented from bringing an action because of inequitable circumstances that were outside of the party's control; (2) that it was without fault or want of due diligence; and (3) that tolling comports with sound legal principles and must be in the interest of justice.

Benson's claim that his only recourse was to investigate is unfounded and in violation of a past arbitration cited by Benson himself – *Tharp v. Texas Commission for the Blind* (R-S 99-9, 2002).

The panel should rule in favor of the Agency and confirm the denial of Benson's untimely request for a full evidentiary hearing.

## FINDINGS AND DISCUSSION

The central issue identified by the Department of Education is whether the Georgia Vocational Rehabilitation Agency violated the Randolph-Sheppard Act when it denied Complainant J. Michael Benson's Grievance/Request for Full Evidentiary Hearing.

The relevant facts are not in dispute and are fully set forth hereinabove.   Mr. Benson is a blind vendor who during the relevant time period operated a vending facility on federal property in Savannah, Georgia, pursuant to the RSA.   The Agency is the State Licensing Agency administering the RSA program in Georgia, known as the Business Enterprise Program.

In October 2021, Mr. Benson first learned that "set-aside payments" for blind vendors with a net income below $200,000 had been suspended from March 2020 through October 2020, presumably to ease the financial burden on smaller vendors most impacted by the COVID-19 Pandemic.   Mr. Benson did not qualify for the set-aside suspension because his net income was greater than $200,000 and continued to pay into the fund.

Mr. Benson learned of the suspension of set-aside payments in October 2021 via two means:   (1) a conversation with another blind vendor, Franklin Hulsey; and (2) an email exchange with Jerry Bensman of the Georgia Co-Op, which assists the Agency in administering the RSA program.   In response to an email from Mr. Benson inquiring whether it was true that set-aside payments had been suspended for a period of time, Mr. Bensman emailed Mr. Benson and confirmed that the Agency had, in fact, suspended set-aside payments for vendors earning less than what Mr. Benson was earning.

After his conversation with Mr. Hulsey and correspondence with Mr. Bensman, Mr. Benson embarked on an investigation to determine if he had ever received notice of the set-aside suspension from the Agency.   He reviewed his email history and determined that he had not, in fact, received notice from the Agency.   Mr. Benson sought legal counsel, which he eventually retained six months later.

On October 4, 2022, counsel for Mr. Benson sent a letter to the Agency demanding repayment of Mr. Benson's set-aside funds, in the amount of $217,372.05, on the grounds they were collected in violation of the RSA.  Via letter dated October 18, 2022, the Agency denied the demand, claiming set-asides had been suspended in accordance with all laws and regulations.

On November 7, 2022, counsel for Mr. Benson, pursuant to Section 107d-1(a) of the RSA, sent a Grievance to the Agency demanding a full evidentiary hearing to address the Agency's alleged violations of the RSA.  The Agency denied the Grievance by letter dated December 12, 2022, citing, *inter alia,* the expiration of the 15-day time limit for filing a grievance/requesting a hearing as set forth in Section IV.B.2 of the Business Enterprise Program Rules and Regulations.  Specifically, per the Agency, the set-aside collection was suspended in March 2020 and, thus, Mr. Benson's November 7, 2022, Grievance, filed over two years later, was grossly untimely.

The parties agree that, per the RSA and the BEP Rules and Regulations, in order for Mr. Benson's Grievance to be deemed timely it must have been filed within 15 days of "any action" arising from the operation or administration of the vending facility program.  The determination with which the undersigned arbitrators are tasked with making, and on which the resolution of this dispute turns, is what constitutes an "action."

Mr. Benson contends the "action" by the Agency upon which he filed the Grievance was the Agency's October 18, 2022, letter denying his demand for repayment of his set-aside funds.  Per Mr. Benson, because his Grievance/Request for Evidentiary Hearing was filed on November 7, 2022 – within 15 working days of the Agency's

"action" of denying his demand for repayment – the Grievance was timely filed and the Agency violated the RSA when it denied the Grievance.

The Agency disagrees with Mr. Benson's characterization of its October 18, 2022, denial letter as the grievable action. Rather, the Agency argues the "action" from which Mr. Benson had 15 days to file a Grievance was the suspension of the set-aside payments in March 2020. Per the Agency, this "action" occurred over two years prior to the filing of Mr. Benson's Grievance, rendering the Grievance untimely.

The term "action" is not defined in the text of the RSA and there does not appear to be dispositive case law. However, the undersigned arbitrators may employ other means and principles in discerning the meaning of the term "action" as used in the RSA. If, as urged by Mr. Benson, the grievable "action" was the Agency's October 18, 2022, denial letter, then his November 7, 2022, Grievance must be deemed timely filed. However, if the actual suspension of set aside payments in March 2020 was the grievable "action," then the Grievance was obviously far beyond the 15-day time limit established in the BEP Rules and Regulations.

A tool sometimes employed by arbitrators in determining the meaning of an undefined term in a statue or contract is simply to look up the common dictionary definition of the term. In the instant case, Merriam-Webster.com defines an "action" as "something done by someone." Similarly, Dictionary.com defines "action" as "the process or state of acting or of being active." In the opinion of the undersigned arbitrators, while the dictionary definition is certainly not dispositive, the act of suspending set-aside payments in March 2020 more closely resembled "something done" than did the Agency's issuance of the October 18, 2022, letter denying repayment and

explaining that all laws and regulations were followed.  In essence, the October 18, 2022, denial letter is an affirmation and explanation of the March 2020 "action" and, of course, would not even have been written absent what occurred in March 2020.

Also helpful in the instant case for interpreting the term "action" is the statutory and contractual construction principle that, where one interpretation of undefined language would lead to an absurd or nonsensical outcome, while the alternative interpretation would lead to a reasonable outcome, the latter interpretation should be adopted.

In the opinion of the undersigned arbitrators, interpreting the Agency's October 18, 2022, letter denying the demand for repayment as the appealable "action" could lead to absurd scenarios.  Furthermore, such an interpretation would allow for no certainty or finality to decisions made by the Agency, as a Complainant could re-set the statute of limitations by simply writing a letter demanding that the Agency's alleged wrongdoing be corrected.

For example, assume, *arguendo*, the arbitrators in the instant case rule in favor of the Agency and deny Mr. Benson's request for an evidentiary hearing, but their decision contains determinative factual errors.  Suppose, then, that Mr. Benson writes a letter to the Agency asking for reconsideration of the arbitrators' decision on the grounds that the arbitrators made clear errors of fact that affected the outcome of the case.  If the Agency then denies Mr. Benson's request for reconsideration, ignoring clear and egregious errors in the arbitrators' decision, Mr. Benson's position would make the Agency's denial an abuse of its discretion and a grievable "action."

Or suppose Mr. Benson writes another demand letter claiming that he miscalculated and the actual amount of reimbursement owed to him is $300,000.  Would an Agency denial of this demand start a new 15-day statute of limitations?  These may be extreme examples, but it is certainly not difficult to imagine a creative attorney reviving an earlier action for which the statute of limitations has expired if Mr. Benson's definition of the term "action" is accepted.

Pursuant to Mr. Benson's theory, any decision made or action taken by the Agency could be revived as a grievable action, regardless of how long ago it occurred, simply by writing a letter demanding that the complained-of decision or action be reversed or have its effects otherwise undone.  Under such a scenario, the 15-day statute of limitations set forth in the BEP Rules and Regulations would be meaningless and no agency action or decision would ever be final.

Disposition of this dispute, however, does not conclude with the determination that the grievable action occurred in March 2020.  Mr. Benson credibly testified that he did not receive notice of the set-aside suspension from the Agency in March 2020 or otherwise become aware of the suspension at that time.

Pursuant to the doctrine of "equitable tolling," a party may bring an action even after the statutory time period to file the action has expired if the party, through no fault of its own, was unable to assert its right in a timely manner.

In the instant case, Mr. Benson asserts he did not receive notice of the suspension of set-aside payments when it occurred in March 2020.  While Agency did not concede this point, Mr. Benson's testimony was credible and thus it is presumed he did not receive notice of the suspension at the time it occurred.  Although there was testimony

that the chairperson told Ms. Eggleston that he posted the decision on the BEP website, there was no evidence regarding whether the chairperson actually posted it or the timing of any such posting.   Accordingly, based on the evidence presented at hearing, it is presumed that Mr. Benson did not have notice of the suspension in March 2020.

In the opinion of Panel members Longo and Elia, the 15-day filing period set forth in the BEP Rules and Regulations did not begin to run for Mr. Benson in March 2020 because he did not know, nor could he reasonably have known, that the Agency suspended set aside payments for certain vendors.   In other words, the time limit was equitably tolled.

The difficulty for Mr. Benson, however, is that the limitation period for filing a grievance was tolled only until he *knew or reasonably should have known* of the suspension of set-aside payments.   There is no dispute that Mr. Benson had actual knowledge in October 2021 that set-aside payments were suspended for certain vendors in March 2020.   This is the point at which "the 15-day clock began ticking" for Mr. Benson.   Whether it was the date of his conversation with Mr. Hulsey or the date of his email exchange with Mr. Bensman, Mr. Benson had 15 days from that October 2021 date to file his grievance and request a full evidentiary hearing.   Because he instead filed it over a year later, Mr. Benson's November 7, 2022, Grievance and Request for a Full Evidentiary Hearing was untimely.

Mr. Benson argues he should not have been required to file the Grievance in October 2021 because he knew Mr. Hulsey had already been denied on timeliness grounds.   Mr. Benson thus believed that filing his own grievance would have been a futile gesture because it would have been similarly denied as untimely by the Agency.

However, as aptly stated in the arbitration case of *Tharp v. Texas Commission for the Blind*, Case No. R-S/99-9 (2002), cited by both parties, "the action that has to be taken within 15 working days is simple and straightforward:  submit a request for an evidentiary hearing.  The hearing itself will be held at a later time, so there is no need to have witnesses prepared within 15 working days.  The legal issues need not be sorted out and properly pleaded within 15 working days, so there is no need to have retained an attorney by that time.  In short, no complicated action is required."

Mr. Benson is not a new participant in the Business Enterprise Program and must be presumed to be aware of the BEP Rules and Regulations, which clearly provide for a 15-day period for filing a Grievance and Request for a Full Evidentiary Hearing.  Arbitrators are cautious of a party's request to dismiss a grievance on the grounds of untimeliness and err on the side of finding that a grievance was timely filed when there is doubt.  Determinations of the merits of disputes are preferable for all parties involved.  However, in the instant case, there is no doubt:  Mr. Benson knew of the Agency's alleged violation of the RSA in October 2021 yet did not file a Request for a Full Evidentiary Hearing within 15 days, as clearly required by the BEP Rules and Regulations.

For the reasons set forth herein, the Agency did not violate the RSA when it denied Mr. Benson's Grievance/Request for Full Evidentiary Hearing.

## ORDER

The Georgia Vocational Rehabilitation Agency did not violate the Randolph-Sheppard

Act when it denied Complainant J. Michael Benson's Grievance/Request for Full

Evidentiary Hearing.


Vincent C. Longo, Chair, Arbitrator
June 14, 2024
Pittsburgh, Pennsylvania


Albert Elia, Arbitrator (Concurring)
June 14, 2024
New York, New York


Andrew Schumacher, Arbitrator (Concurring)
June 14, 2024
Austin, Texas

22

IN THE MATTER OF THE ARBITRATION     )     <u>OPINION AND ORDER</u>

                )

      between               )

                )

JOSPEPH MICHAEL BENSON        )     Case No. R-S/23-01

                )

      and                  )

                )

GEORGIA VOCATIONAL           )

REHABILITATION AGENCY         )

<u>Arbitrator Schumacher Concurring in the Decision</u>

"If it is not necessary to decide more to dispose of a case, then it is necessary not to decide more." *Dobbs v. Jackson Women's Health Org*., 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring in judgment). In its commencement letter, the Department of Education identified the central issue as "whether the SLA's denial of an evidentiary hearing to Mr. Benson is a violation of the Act." Here, all three panel members agree that the SLA did not violate the Act when it declined Mr. Benson's October 4, 2022 request for evidentiary hearing. All three panel members agree that Mr. Benson became aware of the action giving rise to his grievance no later than October 2021, approximately one year prior to filing his grievance, which means he failed to timely file his request for evidentiary hearing pursuant to BEP Rule IV(B).

Where this arbitrator differs from the majority, is in the majority's finding that Mr. Benson did not have reasonable knowledge in March 2020 of the set-aside fee suspension. But whether Mr. Benson knew or did not know of set-aside fee suspension in March 2020 is immaterial because it is undisputed that Mr. Benson had such knowledge in October 2021, approximately a year before he filed the grievance the subject of his arbitration. The Panel only needed to determine whether the SLA violated the Act by

declining his request for evidentiary hearing. The Department of Education did not task the Panel with determining whether Mr. Benson's request for an evidentiary hearing in October 2021 would have been timely based on equitable tolling. Accordingly, this arbitrator disagrees with any portion of the Decision that could be interpreted as a finding that Mr. Benson's claims were equitably tolled until October 2021. Otherwise, this arbitrator concurs in the Decision of the Panel.

Andrew Schumacher, Arbitrator (Concurring)
June 14, 2024
Austin, Texas